MOORE *v.* ROBERTSON *et al.*

(*Supreme Court, Special Term, New York County. July 15, 1890.*)

1. ASSIGNMENT—RIGHT OF ASSIGNEE TO SUE—CONSIDERATION.
  Where the legal title to a chose in action has passed to the assignee thereof, it cannot be objected to the assignee's right to sue that, under an agreement between the assignor and the assignee, the action is for the benefit of the assignor. The consideration of the assignment cannot be inquired into for the purpose of defeating the assignee's action.

2. SALE—INDIVIDUAL PURCHASER—SPECIFIC ALLOTMENTS.
  Several persons agreed with the agent of a corporation to buy 100 shares of corporate stock. At a meeting of the purchasers and the agent, each purchaser called out the number of shares that he would take, and the certificates were afterwards delivered to each subscriber, according to the amount for which he subscribed. The obligation to deliver the stock did not become fixed until the entire amount (100 shares) was subscribed for. *Held*, not a joint purchase, but a sale of specific allotments of a gross amount to individual buyers.

**3. .SAME—RESCISSION—TRUST.**

    The owners of stock, who were officers of the corporation, sold some of their shares under an agreement with the purchasers that the money should be used to buy a certain secret process. After the sellers had placed the money to the credit of the corporation, but before any of it ·had been used, they discovered that there was no secret process. Afterwards this money became so mingled with other moneys of the corporation as to be incapable of identification. *Held,* that the contract of sale would be rescinded, and a return by the sellers of the purchase money decreed, but no trust would be declared as to the funds in the hands of the corporation or its receiver.

    Action by James Moore against James U. Robertson and William H. Cotterill to rescind a sale of certain corporate stock, and to follow the money into the hands of the receiver of the company.

    *Everet P. Wheeler,* for plaintiff.    *R. Burnham Moffat,* for defendants.

    PATTERSON, J. The plaintiff is the assignee of several persons who purchased specific quantities of shares of stock of the Electric Sugar Refining Company, and this suit is brought to rescind the purchases, to recover the purchase price paid, and to follow the money into the hands of the receiver of the company; to . have a trust declared in favor of the plaintiff in such money, or any part of it the receiver may have, to the extent of the aggregate amount of the several claims assigned to the plaintiff; and for other appropriate relief.

    At the threshold of the case, two objections are taken, neither of which is tenable. It is claimed that the plaintiff has no standing in court because of certain arrangements made between him and his assignors whereby the fruits of the action are to accrue to such assignors, and not absolutely to him. Whatever doubt might have.existed on·this subject is dispelled by the case of *Sheridan* v. *Mayor,* etc., 68 N. Y. 30. For the purpose of maintaining this action, the legal title passed to the plaintiff, and a decree herein would be, under the decision in that case, a full protection to the defendants against a future or other suit brought on the same cause of action. There is a transfer, valid and complete according to the law of this jurisdiction, and a legal title has by it been conferred. What the consideration for it was, or whether there was any, or what arrangement or understanding may exist between the parties respecting the ultimate disposition of the proceeds of a recovery, seems, under the case cited, to be of no consequence.

    It is further urged, to defeat the action, that the sale of the shares was of a lot. of 100 undivided shares to an association, or syndicate, as it is called, of purchasers, who bought jointly, and not severally, and that therefore all the purchasers must either unite in the action as plaintiffs or those refusing to do so be made defendants. ˙If this were in substance, and by the intent of the parties, as well as in mere form, a joint purchase, the point would be well taken; but a careful reading of the testimony as to the relation in which the purchasers acquired their respective interests shows that, although the transaction was entered into at a meeting of all the purchasers with the sellers' agent, they did not purchase jointly,—they did not jointly order the whole 100 shares to be distributed among themselves afterwards, but each purchaser bought for himself the exact number of shares for which he subscribed. They were dealing with the agent of the sellers. Their community of action extended only to making arrangements so that the whole number of shares, upon the taking of which in full the obligation of the sellers to deliver depended, might be subscribed for. This is clear from what Pickup, the sellers' agent, says at page 12 of his deposition. He states that at the meeting they called out the number of shares each would take, and the deliveries were subsequently made to each subscriber, as an individual, according to his subscription. The real nature of the transaction was such as to constitute a sale of specific allotments of a gross amount to individual buyers, each taking a designated number of shares, and a joint purchase was not made. The

deliveries were to be directly to the individual purchasers by the agent of the sellers. When it was found that the whole number of shares offered would be taken, the transaction assumed the shape of an independent dealing with each subscriber. Pickup was not the agent of the purchasers for distribution, but he was the agent of the sellers to receive the purchase money, and deliver the certificates of shares.

The ground upon which the plaintiff asks the court to decree a rescission of the transaction is that the sellers have perpetrated a fraud upon the purchasers by using the purchase money for another and different purpose than that to which they promised, as the condition of the purchase, to apply it. On the merits of the case, the material facts, as I gather them from the record, and the effect of such facts, are as follows: Prior to the immediate transaction out of which this suit arises, the plaintiff's assignors were shareholders in the Electric Sugar Refining Company, a corporation organized to carry on the business of refining sugar by electricity, according to an unpatented and undisclosed alleged process, which was said to have been discovered or invented by one Friend, and the knowledge of the particulars or details of which process had been kept secret by Friend, and was supposed, after his death, to be in the possession only of his widow and of one Howard, a stranger to this suit, but who was the owner of certain machinery stated to be used in refining sugar under the alleged process referred to. The capital stock of the company had all been issued as payment for the process and the right to manufacture thereunder, but 4,000 shares were afterwards set aside or donated to the company, and these shares came into the ownership, and under the control, of the defendants, Cotterill & Robertson, the latter succeeding to the interest of one Woodward. Cotterill & Robertson disposed of the greater part of these shares, advancing from time to time the money they received for them (except a very few shares) for the purposes of the company. For several years experiments had been made with results proclaimed to be more or less satisfactory, and large amounts of money had, it was claimed, been expended on such experiments. None of the officers or shareholders knew what the process was. All the parties in interest had great confidence in the undertaking, and anticipated great gains from it. Cotterill was the president of the company, and Robertson its treasurer, and they were very largely interested in its success. In December, 1888, strenuous efforts were made to induce Mrs. Friend (the widow) to disclose the secret of the process that it might be patented for the benefit of the corporation, she being under contract to make the disclosure on certain terms, which required the payment to her of a large sum of money. Taking up the case at this point, it is perfectly clear that in December, 1888, the parties in interest were looking with great anxiety to the immediate revelation to the officers of the company of the secret, and the procurement of a patent by which the process would be secured to the corporation. Thompson, a patent solicitor of Liverpool, had been brought from England, in October or November, by the company to assist in obtaining the patent, and on December 26, 1888, Cotterill was at Milan, in Wisconsin, as he says, "for the purpose of arranging with Mrs. Friend for disclosure of the process and preliminaries for patenting." Cotterill and Robertson were partners, and it is admitted that, in the transaction involved in this suit, Robertson acted for that partnership. With the situation respecting the process, and the patenting thereof, being as stated, and about a week before Cotterill went to Wisconsin for the purpose referred to, and on December 18, 1888, Robertson sent a cable dispatch to his agent at Liverpool, stating that every day was showing the greatest importance of immediate possession of the secret, and requiring about $30,000 to complete necessary funds, and offering 100 shares at £60 per share, provided cash were in New York at end of the month, (there is a significance in this, in view of Cotterill's errand to Wisconsin,) and also authorizing the division of the

shares into several hands, (which is exactly what was done,) provided the whole 100 shares were subscribed for. Pickup, the agent to whom this message was sent, consulted with certain of the Liverpool shareholders, among them the plaintiff's assignors, and on the 19th telegraphed, accepting for seven of them the offer, on receipt of a telegram from Thompson that he would remain in New York until the patents "were lodged for America and mailed for Europe." It is claimed by the plaintiff's assignors that their subscriptions were made and their shares bought to enable Robertson to raise the money necessary to be paid to Mrs. Friend to obtain the secret and to procure the patents, and that there was an assurance given by Pickup, the sellers' agent, that it would only be used for that purpose. This is the vital question of fact in the case. If such a condition were attached to the purchase, the defendants, Robertson & Cotterill, are bound by it as part of the contract made by their agent, Pickup. The terms of the telegram initiating the transaction, and which were made known to the purchasers, indicate that the purpose for which the money was needed was to get possession of the secret, and, on the whole testimony, I am forced to the conclusion that the contract was as the plaintiff claims. Bigland, Latham, Karck, and Robertson all testify that the condition referred to was understood as annexed to the purchase. The only real contradiction is in Pickup's deposition, and I am not at all impressed by his testimony. The view of the purchasers is also sustained by the telegrams following those already referred to. On the 20th, Robertson telegraphed Pickup that special arrangements were completed insuring speedy patenting, and that Thompson would return. On the same day, Pickup sent back a message from the intending purchasers that Thompson's return would be disastrous, and that shares had declined on the mere rumor of his going back to England, and asking Robertson to "state distinctly whether six thousand final sum required." The meaning of this inquiry seems to be quite clear. By the first cable dispatch it was stated that $30,-000, about the equivalent in round figures of £6,000, were required to get possession of the secret, and this inquiry is plainly addressed to the ascertainment of the sufficiency of that amount for that purpose. On the 21st, Robertson sent from New York a message that the offer was accepted; that Thompson had been paid a fee to remain; the £6,000 to be remitted next day, and "Thompson cables Bigland six thousand enables us close Friend." Here is a direct reference to the amount, and the purpose to which it was to be applied, and Robertson notifies the purchasers, through Pickup, that Thompson, the solicitor, will communicate directly to Bigland, one of the purchasers, that the £6,000 will suffice. On the same day, Pickup, at the request of the purchasers, telegraphed Robertson: "Syndicate agrees. Money to-morrow. Request cable when documents disclosing process your possession." Considering this whole telegraphic correspondence together, connecting it with the situation as it stood in the middle and latter part of the month of December, 1888, and the testimony as to what occurred in Liverpool when the subscriptions were made for these 100 shares, I entertain no doubt that the money was sought by the sellers, and the purchase was made merely to enable Robertson to get the funds with which to pay Mrs. Friend the amount required for the surrender of the secret in order that a patent might be obtained, and that there was an agreement to apply it to that purpose; that is to say, that the purchase was made on the understanding that the money should be paid to Mrs. Friend for the secret, and that that was the inducement and condition of the purchase. At the same time, the purchasers were, of course, looking to the profit they might make, the difference between the £60 per share and the selling price in the Liverpool market, but the great object to be obtained was the disclosure of the secret, and the procurement of the patent, as a consequence of which the shares could be greatly enhanced in value by the establishment of the company on the substantial basis of exclusive right

to a known and patented process. The whole .100 shares were subscribed for, but as to 10 of them payment was to be postponed by agreement until the 18th of January, 1889. By special arrangement, 6 more shares were sold. Pickup remitted to New York (with other moneys) £5,400, being the purchase price of the 90 shares. Of this amount the plaintiff's assignors severally paid the following sums, viz.: Page, £600; Bigland, £600; Robertson, £600; Karck, £420; Latham, £1,200. This money was received by Robertson in New York by cable transfer by the 24th of December, two days before Cotterill arrived at Milan, in Wisconsin. Robertson deposited it in his own private bank-account. He did not apply it, nor any part of it, to pay Mrs. Friend for the secret, but loaned it to the company for general purposes, as he had been in the habit of doing with other moneys realized from sales of stock owned by him and Cotterill. In the transaction of the sale of the shares under consideration, Robertson acted for himself and his partner, Cotterill, and not for the company. They disposed of their own stock, and the company was not in any way a party to the dealing. There can be no claim, therefore, against the company or the receiver, based on the idea of an agency for the company residing in the sellers. Those sellers were merely loaners of money to the company. They received the avails of the sale of their own stock on condition that they should use such avails for one specific purpose. It was a purpose of prime importance to every shareholder. It was to secure the one great and crowning necessity for the success of the enterprise, and, inasmuch as the sellers did not devote the money to that purpose, the purchasers who were damaged thereby are entitled to apply to a court of equity to rescind, unless they have estopped themselves from so doing. The power of a court of equity to avoid an executed contract in such a case has not been drawn in controversy here, but is conceded, and therefore it is not necessary to refer to the authorities. It is an inherent power of the court, and the principle upon which it acts is succinctly stated by Lord St. Leonards in *Jorden* v. *Money*, 5 H. L. Cas. 185, as follows: "It is utterly immaterial whether there is a misrepresentation of fact as it actually existed, or a misrepresentation of an intention to do, or abstain from doing, an act which would lead to the damage of the party whom you thereby induced to deal in marriage, [as in that case,] or in purchase, [as in this,] or in anything of that sort upon the faith of that representation."

The question now arises as to the company or the receiver being liable in any way to the plaintiff. As to original liability, there is none, for the company was not a party to the dealing with the purchasers. It is claimed, however, by the plaintiff that the money having been paid (or in effect paid) into the treasury of the company, or used for its benefit generally, under the loan, it would be, and the receiver is, liable, and that as that money can be traced into its possession, a specific lien should be declared upon so much of it as is to be found in the hands of the receiver, and especially upon $10,000 now on deposit as security in certain actions pending in Wisconsin against Mrs. Friend. The facts connected with this phase of the case may be stated briefly: When Robertson received the £5,400 he deposited it in his private bank-account with other moneys of his own. On December 31, 1888, he, as treasurer of the company, caused an entry to be made in its cash-book of $28,108.80 to the credit of the loan account of Robertson & Cotterill, and it is stated in that entry that the sum was the proceeds of 96 shares sold in Liverpool between the 21st and 24th of December, 1888. The money was not actually paid over to the company on December 31st, but at various times in January, 1889, and in various amounts it was paid out for the benefit of or on account of the company; $10,000 of it being sent to Wisconsin as security in legal proceedings taken against Mrs. Friend. All the payments on account of the company, charged on its books against the $28,108.80, seem to have been made after January 4, 1889. They were all made, therefore, after Robertson &

Cotterill had ascertained that there was no secret process, and that the Friends and Howard had imposed upon the company, and those interested in it. On January 2, 1889, according to Robertson's testimony, he and Cotterill broke into the factory, and discovered the great deception the pretended inventors or discoverers had practiced. Information of it was immediately given. Robertson & Cotterill were in no way connected with this stupendous fraud; but they knew several days before anything was paid out by the company from this $28,108.80 that the purpose to which they had agreed to apply the proceeds of the 100 shares could not be accomplished, and they then had it in their power to recall the money by canceling the loan, and return it to the purchasers of the 100 shares.

It is upon this state of facts that the plaintiff claims the right to follow the money of his assignors into the possession of the company, and, through it, into the hands of the receiver, upon the theory that the company held it as a trust fund; it having notice, by the knowledge of Robertson and Cotterill, its treasurer and president, of the limitation of use of that money. It is not clear that the purchase money constituted a trust fund in any sense. Certainly, as to those purchasers who are not represented in this suit, and who have not sought to rescind, the money paid to Robertson cannot be considered as affected by a trust, and, while it is true that each purchaser has his own right, because he dealt as an individual in buying his shares, yet, after all, the transaction was only a purchase and sale. The title to the stock passed on delivery. The sellers became entitled to the money. They were bound, as between them and the purchasers, to use it in a certain way. They failed to do so. That gives a right of rescission, but it seems to me nothing more than that, and a decree that the sellers pay back the purchase money. This is a suit in equity, in which the court is asked, under all the circumstances of the case, to adjudge that the sale was void. Until decree is pronounced, the transaction remains just as it was when the contract was performed. That contract was voidable at the option of the purchasers, and I am not inclined to hold that, on a mere transaction of purchase and sale, a trust follows the fund where the seller agrees to use the money for a specific purpose, and omits or fails to do so. The cases cited by the learned counsel for the plaintiff are not applicable here. But it is unnecessary to pursue the subject further. The receiver is not shown to have in his hands any of the money paid for these shares, unless it may be the $10,000 on deposit in Wisconsin, and, as to that sum, it cannot be held that it is the proceeds of the shares bought by the plaintiff's assignors. The moneys were intermingled from the time they were remitted by Pickup; he sent the amounts paid by the plaintiff's assignors with those paid by the other purchasers, and with yet other money, received from outside sources. Robertson again mingled them with his own money in New York, and it is impossible, as the proof stands in this cause, to say from what source that $10,-000 was derived.

It is urged by the defendants that the plaintiff is not entitled to any relief, as to four of his assignors, because, with full knowledge of the facts, and after the exposure of the fraud of Friend and Howard, they affirmed the purchase by dealing with the shares as their own property, and thereby have precluded themselves from seeking the aid of a court of equity. On a critical examination of the whole case, I am not satisfied that this contention is well founded. As to Bigland, the two shares delivered to his brothers, were as it appears from his answer to the twenty-second cross-interrogatory, subscribed for by him for them, and he delivered them each his certificate for one share after the collapse of the company. This does not bind him to the purchase of his other eight shares. He merely gave to the owners each his evidence of ownership of his one share. But plaintiff, as representing Bigland's interest, can only claim relief as to the eight shares that were Bigland's own property. He does not represent the other two shares. As to Latham, the

contract was made between him and Robertson, and he was the ostensible purchaser. It is true that it appears now that he bought for Joshua Hocking, but he had the legal title to the shares. He would have been treated as the purchaser in any contest arising between him and the sellers, and he has done nothing to bind himself or Mr. Hocking irrevocably to the transaction, and Mr. Hocking's ratification of the assignment to Moore is in evidence. There is nothing to show that Page has bound himself to the purchase with knowledge. Karck's position is sufficiently explained in the testimony. The tenders of stock certificates—if that were necessary before this suit was brought—seem to be sufficient. As to Bigland, his situation is fully explained. What was done by the Farmers' Loan & Trust Company, the transfer agent of the refining company, in canceling the old and issuing the new certificates, is not binding upon him if it made a mistake, and I think it did, for he directed that 10 certificates of one share each be issued for the identical certificate he received from Pickup, and which he forwarded to be surrendered that the transfer he required might be made. There must be a decree that the sale of the shares to the plaintiff's assignors be rescinded, and that the plaintiff recover of the defendants, Robertson & Cotterill, the sums paid by them, respectively, less £120, (being the price of the two shares bought by Bigland on account of his brothers,) with the costs of this action, and that the complaint be dismissed as to the receiver, with costs. The motion of the plaintiff to amend the complaint is denied.